# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | | |
|---|---|---|
| JOSEPH LEROY THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-04303-NKL |
| | ) | |
| CORIZON, L.L.C., | ) | |
| CORIZON HEALTH, INC., | ) | |
| DR. GLEN BABICH, | ) | |
| DR. NARENDRA KHENGAR, | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, Joseph Leroy Thompson, by and through undersigned counsel, and for his Complaint against Defendants Corizon, L.L.C., Corizon Health, Inc., Dr. Glen Babich, and Dr. Narendra Khengar, states and alleges as follows:

## PRELIMINARY STATEMENT

1.  This is an action for damages brought to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiff by provisions of the Eighth Amendment.

2.  Plaintiff alleges that while confined at the Jefferson City Correctional Center ("JCCC"), in the care, custody and control of the Missouri Department of Corrections ("MDOC"), he was denied timely access to adequate and competent medical care for evaluation and treatment of serious medical condition. As a direct and proximate result of Defendants' disregard of both Plaintiff's serious medical condition and accepted correctional medical practices, which were occasioned by Defendants under color of state law, not only was Plaintiff's' hip surgery delayed, but he suffered extensive pain and experienced "bone on bone" grinding.

3. Plaintiff's injuries are the product of Defendants' collective promulgation and/or tacit authorization of departmental and institutional policies, procedures, customs, practices, and actions that not only contemplate a deliberate and systemic disregard for known, obvious, and excessive risks to inmate health and safety, but are also very likely to culminate in a de facto denial of access to adequate medical care and treatment for Plaintiff and the JCCC inmate population as a whole. As such, said policies, procedures, customs, practices, and actions are shocking to the conscience and evince the kind of arbitrariness and abuse of power that operates to deprive Plaintiff and other similarly situated inmates of their constitutional rights.

4. Said policies, procedures, customs, practices, and actions contemplate a continuing, persistent, and widespread pattern of official misconduct that comprises the moving force behind Plaintiff's injuries and evidences deliberate indifference to the health and safety of all inmates confined to JCCC in violation of the Eighth Amendment.

## JURISDICTION AND VENUE

5. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff presents federal claims arising under the Eighth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, and 42 U.S.C. § 1983.

6. This Court has jurisdiction over Defendants because the unlawful acts alleged in this Complaint were committed in Jefferson City, Cole County, Missouri, which lies within the Western District of Missouri.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 105(b) and 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Jefferson City, Cole County, Missouri, which lies within the Central Division of the Western District of Missouri.

## PARTIES

8. Plaintiff Joseph Leroy Thompson is an inmate in the custody of MDOC and currently confined at Tipton Correctional Center.

9. Each of the following Corizon entities (collectively "Corizon") was contracted by MDOC ("MDOC Contract") to provide comprehensive health care services and chronic care for inmates confined to MDOC correctional institutions, including JCCC, where Plaintiff was confined and where the acts and omissions that gave rise to his claims occurred. As such, at all relevant times contemplated herein, and while acting under the color of state law, Corizon not only materially participated in the promulgation of official policies, but it was also contractually obligated to train, supervise, direct, and control all institutional medical and nursing personnel.

   a. Corizon, L.L.C. is a Missouri Limited Liability Company. Corizon's registered agent for service of process is C T Corporation System, located at 120 South Central Avenue, Ste. 400, St. Louis, Mo. 63105. Corizon maintains a corporate office located at 12647 Olive Blvd., St. Louis, Mo. 63141.

   b. Corizon Health, Inc., (f/k/a Corizon, Inc.) is a Tennessee corporation located in Brentwood, Tennessee.

10. Each of the following individuals (collectively "Individual Defendants") are Missouri residents and, at all times pertinent to matter, were employed by Corizon, L.L.C. or Corizon Health, Inc.:

   a. Dr. Glen Babich

   b. Dr. Narendra Khengar

## GENERAL ALLEGATIONS

11. Osteoarthritis is a product of aging and is the most common form of arthritis. Osteoarthritis occurs when the protective cartilage that cushions the bone in the joints wears down. Osteoarthritis progresses over time and cannot be reversed. In its earlier stages, osteoarthritis is managed with medications such as Tylenol and Cymbalta, as well as nonsteroidal anti-inflammatory ("NSAID") medications, such as Motrin. In its advanced stages, osteoarthritis can be extremely painful and debilitating, and is treated with more invasive interventions such as cortisone injections, lubricating injections, or joint replacement.

12. Plaintiff has a history of back and hip pain dating from before 2013. Medical records indicate that Plaintiff had been receiving pain medication for his back and hip pain at least since February 8, 2013, and that over the course of his treatment, he sought several refills.

13. On October 1, 2013, Plaintiff submitted a Medical Services Request for an x-ray of his lower back and hip and believed he had "arthritis maybe[.]" Also on October 1, 2013, Plaintiff attended an appointment with a nurse, Matthew Pittman ("Pittman"), for acute back pain. Plaintiff reported lower back and right hip pain of a year or more duration with a recent increase.

14. During Pittman's examination, Plaintiff limped while he walked and had a reduced range of motion in his right leg. Pittman placed Plaintiff on a weight-lifting restriction of twenty-five pounds for five days, provided instructions, and directed Plaintiff to follow up if his condition worsened or he was unable to carry out normal activities.

15. On October 15, 2013, Dr. Narendra Khengar ("Defendant Khengar") saw Plaintiff, who again reported the history of lower back pain. Defendant Khengar noted that Plaintiff had trouble walking and favored his right leg; that he had a restricted and painful range of motion when bending forward or twisting at the bilateral hips; and that Plaintiff had back spasms.

16. Defendant Khengar ruled out any other new clinical findings, diagnosed Plaintiff with lower back pain and muscle spasm, and prescribed naproxen and analgesic balm. Defendant Khengar elected to pursue a conservative course of treatment to address the acute symptoms to see whether that resolved Plaintiff's complaints.

17. On November 13, 2013, Plaintiff indicated to Defendant Pittman that he was experiencing continued pain in his right hip and right lower back. Defendant Pittman noted that Plaintiff currently received naproxen and muscle rub, and walked awkwardly with a waddle from hip pain. Defendant Pittman further noted that, "Patient states pain at all times of the day but especially when walking." Plaintiff again requested an x-ray due to "joint grinding/popping pain." Defendant Pittman referred Plaintiff to the doctor for further evaluation of "acute pain/alteration in comfort."

18. On December 5, 2013, Dr. Khengar evaluated Plaintiff and noted he had hip pain, a limp in his right hip, and increased difficulty walking. Defendant Khengar assessed Plaintiff with right hip and chronic traumatic back pain syndrome and scheduled x-rays of his right hip, pelvis, and the lumbar-sacral region of the spine. In Defendant Khengar's words, "[a]s the Patient had not responded well to naproxen, I ordered the x-rays to gather additional information to establish a course of treatment." The x-rays were taken on December 9, 2013.

19. On or around December 19, 2013, Defendant Khengar followed up with Plaintiff. Defendant Khengar informed Plaintiff that the x-rays show, among other conditions,' that Plaintiff had "advanced DJD [in] both hips" with a change in the contour of the femoral heads. The examination showed "prominent degenerative changes seen in both hips showing bone-on-bone appearance." Doc. 119-1 at 23. Plaintiff believes he should have received an MRI or hip replacement

surgery at this point; Defendant Khengar wanted to try "conservative management." Defendant Khengar prescribed Plaintiff ibuprofen 800 mg, one tablet twice a day.

20. On February 19, 2014, Pittman saw Plaintiff for renewal of analgesic balm. Pittman noted that Plaintiff reported continued bilateral hip pain and walked with a limp; he referred Plaintiff to a physician.

21. On March 21, 2014, Dr. Stephen Tourjee saw Plaintiff and noted he had DJD bilaterally, worse on the right, with bone-on-bone contact as indicated by the 2013 x-ray. Dr. Tourjee noted Plaintiff could walk the yard. But Plaintiff walked with an abnormal gait that offloaded the weight from his right hip; had a limited range of motion in both hips, worse in the right hip; and had elevated blood pressure, perhaps from pain. Dr. Tourjee continued ibuprofen 800 mg twice a day, started capsaicin cream, and noted Plaintiff may need a cane in the future.

22. On May 1, 2014, a nurse evaluated and then referred Plaintiff to a physician for his request for medical shoes due to his hip pain. The nurse noted that Plaintiff's gait was uneven due to hip pain and referred him for further evaluation.

23. Plaintiff saw Dr. Akinrinola Fatoki on May 6, 2014, and reported pain in lower legs for more than three years. Plaintiff suspected that one of his legs was shorter than the other. Dr. Fatoki noted Plaintiff had osteoarthritis in both hips, and severe osteoarthritis on the right side; he also made a note to consider an orthopedic evaluation.

24. On May 20, 2014, Dr. Fatoki ordered that Plaintiff be enrolled in a clinic for regular evaluation and management of his hip pain. On June 24, 2014, Plaintiff's medication was refilled.

25. On June 18, 2014, Plaintiff reported to Nurse David Robinson' that he thought a provider would be seeing him and possibly ordering an MRI, and he wanted to know "what was

going on." Despite the fact that Plaintiff had been diagnosed with "advanced DJD" in both hips on December 19, 2013, Nurse Robinson "informed [Plaintiff] of [the] inability to treat with surgery until advanced stages"; encouraged Plaintiff to engage in low impact activity; and provided over-the-counter ibuprofen 200 mg one to two tablets, up to four times a day. Plaintiff's prescription was renewed on June 25, 2014.

26. On July 11, 2014, Dr. Fatoki submitted a request for orthopedic evaluation to Dr. Glenn Babich ("Defendant Babich"), who was the Assistant Regional Medical Director for Corizon, LLC, in Missouri. Defendant Babich reviewed the referral and advised Dr. Fatoki to obtain new x-rays to further evaluate Plaintiff's hips, as the most recent were six months old, and resubmit the orthopedic request if indicated. Despite Defendant Babich's order for new x-rays, it does not appear that this order for x-rays was fulfilled and it does not appear there was any follow-up concerning that order.

27. On August 13, 2014, a non-defendant nurse evaluated Plaintiff for a request for medical shoes and noted that Dr. Fatoki's request for an orthopedic consult had been denied. The nurse referred Plaintiff to a medical provider for evaluation for shoes. The medical record indicates that Defendant Babich denied Dr. Fatoki's request for an orthopedic consult.

28. After additional reports of hip pain, Pittman evaluated Plaintiff on August 20, 2014. Pittman noted that Plaintiff walked with difficulty. Pittman reviewed the 2013 x-rays which showed "prominent degenerative changes," and referred Plaintiff to a doctor for further evaluation. Plaintiff stated that the ibuprofen was not helping with his pain, and Pittman noted Plaintiffs "severe pain not responding to NSAIDS" and "severe pain accompanied by increased swelling and decreased joint motion."

29. Plaintiff refused to attend the appointment with Dr. Fatoki the next day. Plaintiff requested medical shoes again on September 10, 2014, and saw Pittman. Pittman noted that Dr. Fatoki had evaluated Plaintiff for his severe DJD in May and submitted an orthopedic referral which had been denied.

30. On September 30, 2014, Dr. Fatoki evaluated Plaintiff. Dr. Fatoki noted that Plaintiffs history of "pain in lower legs for over two years[,] mainly affecting RT hip," "severe DJD," and that Plaintiff was requesting new shoes. Dr. Fatoki noted to pursue the referral for orthopedic evaluation, continue NSAIDs despite indications that Plaintiff's pain was not responsive to NSAIDs, and follow up with Plaintiff in three months.

31. On November 17, 2014, a non-defendant nurse saw Plaintiff after a report of leg pain. This time, Plaintiff complained of his left leg being swollen and hurting. The nurse noted "reviewed patients file and patient has DJD informed pateint with him having right hip pain, that he is compensating on the left leg that he is having pain to that side as well" [sic]. Again, despite earlier indications in the record that ibuprofen and NSAIDs were not working, the nurse provided over-the-counter ibuprofen, noting that Plaintiff was out of prescription ibuprofen. On November 24, 2014, Plaintiff requested an MRI test and again requested medical shoes to soften the pressure on his hip and lower back until he could receive surgery.

32. On November 26, 2014, Plaintiff saw Nurse Robinson, who indicated that Plaintiff had "not been getting his ibuprofen 800." It appears Nurse Robinson again provided over-the-counter ibuprofen for the interim until he could get someone in medical to refax a prescription.

33. It was not until December 5, 2014, that Dr. Khengar refilled Plaintiff's prescription ibuprofen. Also on December 5, 2014, Wanda Laramore, Health Services Administrator

("Laramore"), advised Plaintiff that an MRI was a diagnostic test, not an accommodation, and needed to be ordered by a physician. She advised Plaintiff to submit for a sick call request. She further stated that Plaintiff should purchase athletic shoes from the canteen to "provide appropriate cushioning of the hips."

34. On December 10, 2014, Nurse Robinson referred Plaintiff to a provider for possible "layin for bottom bunk bottom walk" after he reported chronic hip pain and trouble being housed in a top bunk on the "top walk."

35. On December 16, 2014, Plaintiff reported that his medical condition will not allow him to participate in athletic events and requested medical shoes as an accommodation. On December 18, 2015, his appeal of the denial of medical shoes was denied; he was told that athletic shoes from the canteen would suffice.

36. On December 23, 2014, Dr. Ronald Proctor ("Proctor") evaluated Plaintiff for bilateral hip pain. Again, despite the earlier notation that Plaintiff was not responding to NSAIDs, Proctor changed Plaintiff's medication to a different NSAID, Mobic (meloxicam) 15 mg tablets, once a day.

37. On January 7, 2015, Plaintiff again requested lay-in for bottom bunk and bottom walk and reported that Mobic only helped minimally.

38. On January 21, 2015, Proctor followed up with Plaintiff, switched him back to ibuprofen, one 800 mg tablet, three times a day, provided an ACE wrap for Plaintiff's leg, and authorized bottom bunk and bottom floor lay-ins.

39. On or about January 29, 2014, Krystal Houston, Director of Nursing ("Houston"), provided Plaintiff an ACE wrap.

40. On February 9, 2015, Pittman saw Plaintiff for a request to renew the analgesic balm. Doc. 119-1 at 42-43. Additionally, although Proctor had approved lay-ins at the previous appointment, it was not until this date that Pittman updated the system concerning the lay-ins. Pittman referred Plaintiff to a doctor. Dr. Karen Johnson met with Plaintiff on February 23, 2015. Plaintiff again reported that the ibuprofen did not provide relief, although the capsaicin was helpful, and that he remained active with exercise. Dr. Johnson prescribed an additional NSAID medication called Indocin (indomethacin), 50 mg capsules twice a day, a stronger capsaicin cream, and advised Plaintiff to continue with range of motion exercises.

41. On February 25, 2015, Plaintiff told Pittman he needed to speak with a doctor about his hip and back pain, and Pittman referred Plaintiff.

42. The next day, February 26, 2015, Plaintiff was seen by Laurel Davison, a nurse practitioner ("Davison"). Plaintiff requested an MRI and asked to switch back to taking only ibuprofen because Indocin did not help. Plaintiff also reported popping bilaterally with movement and pain in his groin area. Davison noted that Plaintiff had a mild arthralgic gait, which indicated joint pain, a limited range of motion in his hips, and bilateral hip arthralgia. She discussed the matter with Defendant Khengar; Defendant Khengar did not think an MRI would be approved in light of Plaintiff's success in performing his activities of daily living ("ADLs"). Davison noted to consider physical therapy to strengthen supporting musculature and noted to follow up with Plaintiff with a detailed ADL assessment and hip physical therapy ("PT") exercise instruction.

43. Defendant Khengar noted that the x-rays had been sufficient to diagnose Plaintiff's advanced DJD in his hips; therefore, there was no indication for an MRI.

44. On March 6, 2015, Plaintiff questioned his medication and requested to see "everything in writing."

45. It was not until April 15, 2015, that Davison performed a detailed ADL assessment to view the extent that Plaintiff's advanced DJD interfered with his ability to perform ADLs. Davison noted, among other things, that Plaintiff: has difficulty sitting on the ER cot, has an arthralgic gait with shuffle, and avoids flexion at the hips. She included this description: "Places foot behind knee and swings shoe to meet foot with some level of skill."

46. Also on April 15, 2015, Davidson reviewed the 2013 x-rays, describing them as indicating "prominent degenerative changes in both hips showing bone-on-bone appearance." Davison discussed the case with Defendant Khengar. Davison planned to start Plaintiff on stretching exercises with follow up to monitor for improvement. Depending on the results, she would consider further physical therapy. Nursing was ordered to perform the stretching exercises with Plaintiff three times a week for four weeks.

47. Beginning on May 21, 2015, and continuing through June, 2015, Plaintiff met with a nurse to perform his stretching exercises. There are many notations of Plaintiff grimacing and indicating pain; a popping or grinding sound was heard by the nurse and Plaintiff every time he tried to bend over to touch his toes. Doc. 119-1 at 49-55. Plaintiff did not believe the exercises helped. Per Plaintiff, "all those stretch exercises did nothing but inflamed the pain and suffering and NP Davison tried to hurt me by pulling my leg up while I was lying on my back."

48. On May 26, 2015, Nurse Cyndee Howell ("Howell") met with Plaintiff and noted to schedule a follow-up appointment with the physician to discuss Plaintiff's concerns.

49. On June 9, 2015, Proctor determined that Plaintiff did not meet the criteria for a medical shoe accommodation. Also on June 9, 2015, Davison saw Plaintiff to assess his progress with the stretching exercises. Davison noted a mild improvement in his hip flexure after the stretching exercises, but no improvement with lateral range of movement.

50. Davison made a notation to have Plaintiff scheduled for further evaluation and sent an email to Defendant Proctor concerning the next steps for treatment. Per Proctor's orders, on June 11, 2015, Plaintiff underwent new x-rays. The x-ray showed significant progression of the DJD in the right hip when compared to the 2013 x-rays, while the DJD remained stable in the left hip.

51. On June 24, 2015, Proctor noted that Plaintiff "walks with noteable limp." He reviewed with Plaintiff the x-rays — which showed advanced degenerative changes of the right hip with bony collapse and change in contour of the femoral head, a significant progression compared to prior studies — and changed his medication back to Mobic 15 mg, despite earlier patient complaints that this medication only helped minimally, to address his pain.

52. On June 30, 2015, Dr. Proctor issued Plaintiff a lay-in for a walker, which Houston noted on July 1, 2015. Plaintiff additionally requested medical shoes on July 1, 2015.

53. On July 13, 2015, Plaintiff reported to Pittman that he needed his prescription ibuprofen restarted, and Defendant Pittman referred him to a physician.

54. Proctor evaluated Plaintiff on July 15, 2015, but did not renew the ibuprofen. Plaintiff requested a refill of Motrin but Plaintiff had been switched off of Motrin and back to Mobic. Plaintiff received a walker on or about July 22, 2015.

55. After Plaintiff reported continued pain on the Mobic, Proctor followed up with him on July 23, 2015, and made a notation to consider hip replacement surgery because the x-rays indicated severe DJD impairing Plaintiff's ADLs.

56. On July 31, 2015, Dr. Johnson met with Plaintiff, discontinued Mobic, and restarted ibuprofen 800 mg three times a day. Plaintiff also requested the status of an MRI.

57. On August 3, 2015, Proctor noted that Plaintiff demonstrated severe pain on assessment and used a walker to ambulate, stating that the treatment plan includes a right hip replacement with a left hip replacement later. Proctor forwarded additional information to Defendant Babich, who approved a referral for an orthopedic consult with Dr. Krautmann.

58. On August 12, 2015, Dr. Krautmann evaluated Plaintiff and recommended that he receive a total right hip replacement. Proctor changed Plaintiffs duty status to reflect his impairment and sent a request that Plaintiff receive a right hip replacement as recommended. Babich approved the surgery.

59. Dr. Krautmann performed the right hip total replacement surgery on September 2, 2015, and Plaintiff was admitted into the MDOC's TCU (transitional care unit) for nursing care on September 3, 2015. During his stay at TCU, both Defendant Khengar and Proctor noted Plaintiff progressed well without complications. Plaintiff was discharged from TCU on September 9, 2015.

60. On September 23, 2015, Dr. Krautmann evaluated Plaintiff in follow up and, after reviewing new x-rays, determined Plaintiff was doing well and nearly full weight-bearing on his right hip. Dr. Krautmann noted that Plaintiff would need total replacement "done at some point" on his left hip and planned to see Plaintiff as needed. More specifically, Dr. Krautmann noted "can do left hip replacement in 4 to 6 weeks when the patient is ready."

61. On September 29, 2015, Plaintiffs request to have a walker rather than a wheelchair was referred to Houston.

62. On September 30, 2015, Proctor followed up with Plaintiff, reviewed Dr. Krautmann's notes, noted Plaintiff was doing very well, and planned a left hip replacement in four to six weeks.

63. On October 13, 2015, after restarting Plaintiff on analgesic medication and capsaicin cream, Proctor submitted a request for replacement of the left hip joint because Plaintiff was "ready."

64. On or about October 14, 2015, despite Dr. Krautmann's statement that Plaintiff was to have his right hip replaced four to six weeks after his left hip was replaced and despite Proctor's opinion that Plaintiff was ready, Dr. Babich denied or deferred the second hip replacement surgery.

65. On November 16, 2015, Proctor met with Plaintiff and determined he was doing well but still needed the walker to ambulate due to left hip pain. Proctor advised Plaintiff that the left hip replacement would occur in the future.

66. At Plaintiff's request, on December 21, 2015, Proctor renewed Plaintiff's layins for bottom bunk and bottom walk.

67. On January 14, 2016, a nurse practitioner evaluated Plaintiff in the chronic care clinic. Plaintiff received ibuprofen and capsaicin cream for pain management, but reported the pain in his left hip had worsened and some days he could not walk. Plaintiff used his walker folded up to ambulate. A nurse assessed Plaintiff's left hip as worsening. She renewed Plaintiff's ibuprofen of 800 mg, three times a day, acetaminophen, and capsaicin twice a day.

68. On March 17, 2016, Dr. Danette Stieferman, who is not a defendant, evaluated Plaintiff for reported left knee pain, which Plaintiff attributed to having one shorter leg. Plaintiff

reported that his left hip hurt and that he was under the impression he was supposed to have received a left hip replacement shortly after the right hip replacement but it that it had never happened. He reported minimal relief from ibuprofen and capsaicin, difficulty walking to eat, difficulty dressing, and nocturnal waking from pain. Dr. Stieferman noted that Plaintiff ambulated to the appointment with a walker and had a very "wobbly" gait. After evaluation, she reviewed Dr. Krautmann's records, and Plaintiff's prior x-rays. After discussing the matter with Dr. Bredeman, who is not a defendant, Dr. Stieferman confirmed with the correctional officers that Plaintiff always used his walker and ambulated "like a penguin." Based on this, Dr. Bredeman approved left hip replacement on March 23, 2016.

69. On April 29, 2016, Plaintiff received a total left hip replacement. Plaintiff was admitted into TCU on May 1, 2016, for nursing care and postsurgical monitoring.

## COUNT I:
## SECTION 1983: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED ("INDIVIDUAL DEFENDANTS")

70. Plaintiff incorporates the general allegations above.

71. Each of the Individual Defendants was deliberately indifferent to Plaintiff's serious medical needs relating to his degenerative joint disease ("DJD") in delaying various necessary medical treatment, including x-rays, a timely diagnosis, referral to orthopedics, and hip surgery.

72. Each of the Individual Defendants was deliberately indifferent to Plaintiff's serious medical needs relating to his degenerative joint disease ("DJD") by denying him medical shoes and adequate pain medication.

## COUNT II:
## SECTION 1983: UNCONSTITUTIONAL POLICY, CUSTOM, OR FAILURE TO TRAIN OR SUPERVISE ("CORIZON")

73. Since at least 2007, MDOC has contracted with Corizon to provide health care services for inmates at JCCC.

74. Corizon's policies, procedures, customs, practices, and actions – which, through the conduct and deliberate omissions of its employees and agents, were so widespread and persistent as to represent official policy – recklessly disregarded substantial risks of serious harm to inmates and inflicted injuries that are actionable under 42 U.S.C. § 1983.

75. Corizon's collective abdication of policy-making and oversight responsibilities and/or their inadequate policies, procedures, customs, practices, and actions – as well as their inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies – reached the level of deliberate indifference and resulted in a constitutional injury manifesting itself in the unnecessary and wanton infliction of pain because of their collective and tacit authorization of personnel misconduct.

76. More specifically, MDOC's and Corizon's inadequate policies, procedures, customs, practices, and actions – as well as their inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies – permitted:

   a. Failures to provide professional medical judgment and care that would be ordered by outside treating physicians;

   b. Failures to note urgent conditions or conditions that necessitate regular assessment, monitoring, and follow-up;

   c. Delays or non-responses to noted urgent conditions;

   d. Failures to assure timely access to care by requiring inmates to submit multiple MSRs to be evaluated by a physician, if at all;

   e. Failures to provide cogent nursing directives for prioritizing MSRs and sick calls;

f.  Failures to assure staff competency, especially among physicians and nurses, including the establishment of policies, procedures, and processes to detect and respond to incompetency;

g.  Delegating clinical determinations to nursing personnel who are neither qualified nor licensed to independently make such determinations;

h.  Poor quality nursing, including failures to: note urgencies and conditions requiring further evaluation and treatment, schedule follow-up appointments for on-site care or off-site specialty care, and collect past medical records from prior treating physicians;

i.  Failures to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, not providing adequate treatment; and not providing the care ordered by off-site treating physicians;

j.  Utilizing "conservative" treatment methodologies unless or until a medical condition becomes emergent, in contravention of prevailing medical practices;

k.  Belated or untimely authorization of off-site specialty medical care and treatment;

l.  Failures to provide inmates with qualified medical opinions rendered by on-site and off-site physicians;

m.  Failures to inform inmates of their conditions and diagnoses and to permit them to participate in decisions involving their care;

77. The systemic deficiencies listed above are the product of official policies, procedures, customs, practices, and actions that were promulgated or tacitly authorized Corizon personnel vested with final decision-making authority – and all of them caused or materially contributed to the systemic and unconstitutional deliberate indifference to Plaintiff's serious medical needs and the unnecessary and wanton infliction of pain he experienced.

78. Corizon's official policies, procedures, customs, practices, and actions, which are the moving force behind Plaintiff's injuries, operated to deprive Plaintiff of the right to adequate and appropriate diagnosis and treatment of his serious medical conditions, and, but for the same, he would not have been deprived of rights secured by the Eighth Amendment.

79. Collectively, Defendants' acts and omissions not only contemplate a conscious disregard of a substantial risk of serious harm to inmate health and safety, but said acts and omissions are also sufficiently harmful to evidence deliberate indifference to the serious medical needs of Plaintiff and the other inmates in their charge.

80. Defendants' acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of utilization management practices that elevate cost savings over prevailing medical practices and patient care – but they also evince a complete and deliberate indifference to and a conscious and reckless disregard of the rights of Plaintiff and all inmates in the custody of the MDOC who have Corizon as their sole source of medical care. Therefore, Plaintiff is entitled to an award of punitive or exemplary damages in an amount sufficient punish Defendants or to deter Defendants and others from like conduct in the future.

81. Plaintiff is entitled to recover his reasonable attorney fees, costs, and expenses from Defendants as provided by 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing considerations. Plaintiff requests that this Court after a trial by jury enter Judgment against Defendants for compensatory damages and exemplary or punitive damages are proven at trial; for reasonable attorney fees, costs, and expenses incurred herein as provided by 42 U.S.C. § 1983; and for such further legal and equitable relief as the Court may deem just and proper.

Dated: June 26, 2019                    Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: /s/ Brent Dwerlkotte
   Brent Dwerlkotte #62864
   Scott Kaiser #54925
   2555 Grand Blvd.
   Kansas City, Missouri 64108-2613
   Ph: 816.474.6550
   Fax: 816.421.5547
   dbdwerlkotte@shb.com
   skaiser@shb.com

*Attorneys for Plaintiff Joseph Thompson*